

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## 06-20-00012-CV

_____

### IN THE INTEREST OF L.W. AND K.R., CHILDREN

On Appeal from the County Court at Law No. 2
Gregg County, Texas
Trial Court No. 2018-1352-CCL2

Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Justice Stevens

# OPINION

The Department of Family and Protective Services (the Department) filed a petition in the County Court at Law No. 2 of Gregg County seeking to terminate Mother's rights to her two children, L.W., and K.R.[1] After a bench trial, the trial court found that (1) Mother knowingly placed or knowingly allowed L.W. and K.R. to remain in conditions or surroundings that endangered their physical or emotional well-being; (2) Mother engaged in conduct or knowingly placed L.W. and K.R. with persons who engaged in conduct that endangered their physical or emotional well-being; (3) Mother failed to comply with the provisions of a court order that established the actions necessary for them to obtain the return of L.W. and K.R. after they were left in conservatorship of the Department; and (4) termination of Mother's parental rights was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (2) (Supp.).

On appeal, Mother contends that (1) the evidence was legally and factually insufficient to terminate her rights under subsections D, E, and O and (2) the evidence was legally and factually insufficient to show that termination was in the best interests of the children. Because we conclude that (1) sufficient evidence supports termination under grounds D and E, and (2) sufficient evidence supports the finding that termination was in the children's best interests, we affirm the trial court's judgment.

---

[1] To protect the confidentiality of the children involved, this Court will refer to all involved parties by fictitious names and the children by their initials. *See* TEX. R. APP. P. 9.8(b)(2).

## I. Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). This Court is required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *Id.* (quoting *A.B.*, 437 S.W.3d at 500). "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *Id.* (citing TEX. FAM. CODE ANN. § 161.001; *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007 (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009))). "This standard of proof necessarily affects our review of the evidence." *Id.*

3

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine 'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'" *Id.* (quoting *H.R.M.*, 209 S.W.3d at 109 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)) (citing *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266). "'[I]n making this determination,' we must undertake 'an exacting review of the entire record with a healthy regard

4

for the constitutional interests at stake.'" *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (quoting *C.H.*, 89 S.W.3d at 26)).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, 'the rights of natural parents are not absolute; protection of the child is paramount.'" *Id.* (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)) (citing *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003)). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26)).

"Only one predicate finding under Section 161.001[b](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *Id.* at 923 (quoting *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied) (quoting *A.V.*, 113 S.W.3d at 362) (citing *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet))). Even so, in *In re N.G.*, the Texas Supreme Court held that due process demands that we review the evidence supporting findings under Grounds D and E when they are challenged on appeal because termination of parental rights under these Grounds "may have implications for . . . parental rights to other children." *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam). As a result, we focus our analysis on Grounds D and E.

## II.     The Evidence at Trial

As this case began, Mother and Father had two children together, L.W. and K.R.[2]  In May 2018, just two weeks after K.R. was born, the Department contacted Mother because she had called the police and reported Father for domestic violence.  Mother claimed that, while the children were present, she and Father got into a fight and she was "thrown to the floor" and "choked."  When the police arrived, they took photographs of her injuries.  Mother admitted that she and Father had a history of domestic violence, but she did not press charges because she only called law enforcement to scare Father.

The Department came to see Mother the next day and told her not to have any contact with Father.  Yet, she admitted that she continued to give Father a ride to work.  She testified that she knew if the Department found out about the rides that "the girls would have been removed" from her care.  She also testified that, while Father moved in with his sister, Mother moved herself and the children to a domestic violence shelter in Gainesville, Texas.

In July 2018, when L.W. was one year old and K.R. was two months old, the Department filed its initial petition for protection, conservatorship, and termination.  The children were removed form Mother's care and placed into the temporary care of Foster Mom.

Mother explained that a friend helped her get into Rahab's Retreat and Ranch, a domestic violence shelter that helps women get back on their feet by providing an in-house day care as well as counseling sessions and other programs.  Mother confirmed that she had engaged in Department

---

[2]During the pendency of this case, Mother became pregnant and gave birth to a third child, J.R.

services at Rahab's for almost six months.[3]  Mother received a monitored return of the children, and she acknowledged that one of the provisions of the court-ordered monitored return was that she was required to stay at Rahab's with the children.  She testified that she had no intention of staying at Rahab's once her children were returned to her.  About a week after she got the children back, she left Rahab's without informing the Department, explaining that she "just wanted to get [the Department] out of the way and then . . . return back to [Father]."  Mother knew that leaving directly violated the trial court's order.

Other residents and employees of Rahab's testified regarding Mother's behavior and interactions with the children while there.  Brooke Avery, a resident at Rahab's, testified that Mother "got really upset and . . . pretty verbal" when K.R., who was having "bad stomach cramps," "pooped all over everything" after she was given medicine.  Avery asked her mentors at Rahab's to "talk to [Mother], do something" because Mother was "verbally abusive."  Avery heard Mother say that "she didn't care if the baby was in pain, if the baby cried all night.  She just wanted her to shut up.  She didn't want to deal with it."  Avery witnessed Mother "slapping" the children, spanking them "hard," and being "rough" with K.R.

Dawn Meyers testified that, while she lived at Rahab's, she was concerned about the children's safety.  Mother would often leave the children "a lot with other people" or leave them unattended for long periods of time.  She recalled an incident where Mother left K.R. in a highchair unattended for forty-five minutes.  Meyers testified that she witnessed Mother "cursing about the children."

---

[3]Mother testified that Father was in jail at that time.

Mother's assigned mentor at Rahab's, Treva Wilcox, testified that other of Rahab's residents expressed concern with Mother "about things that [were] happening when staff [was] not around." Wilcox described an incident where K.R. was struggling to breathe, but she responded favorably to treatment. The incident lasted about five minutes, and while Mother was "completely aware" of what was happening, it surprised Wilcox that Mother "was not hanging around, . . . was not standing beside [her] concerned" but was instead preparing her own lunch. Wilcox testified that Mother became agitated when given parenting advice. After she spoke with a Department representative, Mother "began to bang her hands on her knees . . . really, really hard" and even though she "had a pen in one hand . . . she just kept jabbing that pen angrily in her knees."

The children's Foster Mom testified that she first met Mother when she was volunteering at Rahab's. On one occasion, she observed Mother entering the facility's daycare, grabbing L.W. by the arm, and screaming and shouting at the child. At another time, when Foster Mom was dropping the children off for their visit with Mother at "the CPS office in Tyler," K.R. was crying and did not want to go, but Mother "grabbed" the child and said, "I wish you would quit this shit." Upon returning from church one day, she found Mother sitting on the counter, "punching her hands" and stating, "I effing want to kill this girl. I effing want to kill this girl." Seeing that Mother was angry, Foster Mom asked about the children, and Mother told her, "I don't know, but anybody can have them, I don't care. I'm mad right now at this girl for telling me how to raise my babies." She found K.R., still in her car seat, sitting on a dining room table, and she believed that the child had been sitting there unattended for "a pretty good period of time."

After leaving Rahab's, Mother traveled to Fort Worth, where she waited until Father got out of jail on November 19, 2018. Mother, Father, and the children then moved into a motel in Gainesville. Shortly thereafter, they spent Thanksgiving with Mother's family in Oklahoma. Following lunch on Thanksgiving Day, K.R. was not feeling well. K.R. was then taken to the hospital where she was diagnosed with "RSV and a viral pneumonia."[4] Because she was living in a motel room and K.R. was sick, Mother called her Department caseworker, LaHoma Lewis-Pittman, who came and took the children back into Department custody. Mother's monitored return of the children was revoked, and she received only supervised visitation.

After losing custody of the children, Mother and Father continued to live together in the motel in Gainesville, despite their history of domestic violence. Father obtained employment, and they told Lewis-Pittman that they would "work services together." Then early in 2019, Mother and Father moved to Dallas and eventually moved into an apartment.

Mother completed a psychological evaluation and parenting classes, and she had participated in at least three domestic violence programs. Maria Parides, a licensed therapist who counseled both Mother and Father, testified that both had reported being involved with domestic violence and reported a history of hitting each other. Parides explained that Mother had participated in therapy sessions. She also explained that Mother and Father participated in a few joint sessions, but neither was successfully discharged from counseling, as Mother failed to attend her required sessions in May or June and only attended one in July. Parides testified that Mother still had sessions to complete because she and Father were "trying to continue to learn to be with

---

[4]RSV stands for respiratory syncytial virus.

each other as a couple because they stated they wanted to be together." Though Parides had concerns with Mother having custody of the children, she conceded that she had never observed Mother with the children and that Mother was a willing participant in counseling sessions.

While Mother and Father were participating in the court-ordered services, the Department began to work toward a second monitored return of the children by allowing Mother to have unsupervised weekend visitations with the children. Mother was to supervise Father's time with the children because his hair-follicle test showed positive for cocaine. Mother denied that she ever left the children unsupervised with Father.

Mother testified that, when she and Father woke on Saturday, May 4, 2019, they woke the children and began changing their diapers. Mother claimed that K.R. was in her lap and L.W. began jumping on the bed, "trying to jump back and forth between [her arms] and [Father's] arms." Despite telling L.W. to be careful around K.R., L.W. accidentally headbutted K.R. during one of her jumps. While K.R. cried some after the accident, Mother did not notice any bruising until the next day when she noticed a "big black bruise on [K.R.'s] cheek." She denied seeing any bruising on K.R.'s forehead or abdomen. After taking the children to a Cinco de Mayo parade that morning, Mother remembered K.R. throwing up once in the car. Mother testified that, when Foster Mom picked the children up that evening, she told her what had happened to K.R.

Foster Mom testified that, on a Friday afternoon in May 2019, she left the children with Mother and Father for their weekend visitation, and she picked them up the following Sunday, May 5, 2019. On her way home, K.R. was "moaning," so she stopped to check K.R.'s diaper. Noticing bruises on K.R.'s face and abdomen, Foster Mom took K.R. to the emergency room at

Good Shepherd Memorial Hospital, where the child was treated and photographs were taken of the child's bruises.[5] When asked about the bruising on K.R.'s abdomen, Mother said she believed it was possible that Father injured K.R., but she did not know when it could have happened.

The hospital records report that K.R. was vomiting and had bruises on her forehead, left cheek, stomach, and back. Elisa Berry, a nurse practitioner, testified that K.R. had been her patient on several different occasions throughout her time in foster care, including the emergency room visit. Berry explained that, while K.R.'s x-rays, ultrasound, and liver tests were normal, she had never seen bruises on the child like she observed that night. Berry also testified,

> Facial bruising is always a concern to us because children do not generally get bruises on their face, as well as the abdomen, that's not generally a place where toddlers or babies get bruising. The knees, the legs, the shins, a little bit more so because they're falling, things like that. But the face and the abdomen are just never, never normal, especially multiple bruising.

The hospital released K.R. later that night, but a few days later, Foster Mom brought K.R. back to the emergency room because the child would not stop vomiting, refused to eat, and was not making as many wet diapers as usual. K.R. remained hospitalized for four days.

Kristen Reeder, M.D., a professor at The University of Texas Southwestern Medical School and child abuse pediatrician with the REACH[6] Program at Children's Medical Center in Dallas, testified as a specialist in both pediatrics and child-abuse pediatrics. Reeder received and reviewed K.R.'s medical records and the photographs from her May visits to the emergency room as well as her prior medical records. She confirmed that the photos showed bruises on K.R.'s face,

---

[5]The photographs were admitted into evidence without objection.
[6]REACH is the acronym for Referral and Evaluation of At-Risk Children.

abdomen, and arms and "multiple bruises over her body." Reeder testified that, by the time she personally examined the child on June 5, 2019, the bruises had all healed. Although the results of the examination were normal, the photographs and medical records concerned Reeder. Reeder explained that K.R.

> had bruising to multiple areas of her body, including locations that are not typically bruised in the course of normal play. And . . . her findings were most consistent with an intraabdominal injury, as well, and . . . none of [the injuries] would have been explained by the history that had been provided.

In Reeder's opinion, K.R.'s injuries were "most consistent . . . with inflicted injury and child physical abuse," but she had no opinion regarding who caused K.R.'s bruising.

After investigating K.R.'s injuries, the Department sought termination of Mother's and Father's parental rights. After a two-day bench trial, on the Department's petition to terminate Mother's parental rights[7] to then two-year-old L.W. and one-year-old K.R.,[8] the trial court granted the petition to terminate, finding that (1) Mother knowingly placed or knowingly allowed L.W. and K.R. to remain in conditions or surroundings that endangered their physical or emotional well-being; (2) Mother engaged in conduct or knowingly placed L.W. and K.R. with persons who engaged in conduct that endangered their physical or emotional well-being; (3) Mother failed to comply with the provisions of a court order that established the actions necessary for her to obtain the return of L.W. and K.R. after they were left in conservatorship of the Department for not less than nine months as a result of their removal for abuse or neglect; and (4) termination of Mother's

---

[7]The Department also sought termination of Father's parental rights to L.W. and K.R. Father relinquished his parental rights to the children, the trial court terminated his parental rights, and he is not a party to this appeal.

[8]L.W. was one year old and K.R. was two months old at the time the Department's original petition was filed.

parental rights was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (2). Mother appealed.

## III. Sufficient Evidence Supports Termination Under Ground D

Subsection (b)(1)(D) permits a termination when the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). "Under this Section, we must examine the time before the children's removal to determine whether the environment itself posed a danger to the [children's] physical or emotional well-being." *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.). "A child is endangered when the environment creates a potential for danger that the parent is aware of, but disregards." *In re N.B.*, No. 06-12-00007-CV, 2013 WL 1605457, at *9 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.). "[S]ubsection (D) permits termination [of parental rights] based on a single act or omission [by the parent]." *L.C.*, 145 S.W.3d at 797; *see In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied). "[A]busive or violent conduct by a parent or other resident of a child's home can produce an environment that endangers the physical or emotional well-being of a child." *In re B.E.T.*, No. 06-14-00069-CV, 2015 WL 495303, at *5 (Tex. App.—Texarkana Feb. 5, 2015, no pet.) (mem. op.) (quoting *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied)).

"Similarly, 'a parent's failure to remove [herself] and [her] children from a violent relationship endangers the physical or emotional well-being of the children.'" *Id.* (quoting *In re I.G.*, 383 S.W.3d 763, 770 (Tex. App.—Amarillo 2012, no pet.)) (citing *D.O. v. Tex. Dep't of*

13

*Human Servs.*, 851 S.W.2d 351, 354 (Tex. App.—Austin 1993, no writ), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 267 ("finding evidence of child's residence in unstable household where violence frequently occurred and where ex-felons engaged in ongoing criminal activity resided was sufficient to sustain termination based on finding parent allowed child to remain in surroundings that endangered physical or emotional well-being")). "Moreover, illegal drug use by a parent likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being." *L.E.S.*, 471 S.W.3d at 925 (citing *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)); *see N.B.*, 2012 WL 1605457, at *9.

Here, the Department first became involved in this case when, two weeks after K.R.'s birth, Father threw Mother onto the floor and choked her in the presence of the children. Even so, Mother refused to press charges. Parides testified that, during counseling, Mother and Father admitted "that they had a history of hitting each other," and Mother admitted that domestic violence was a concern for her and her children's safety, but she continued to have contact with Father prior to the children's removal. *See B.E.T.*, 2015 WL 495303, at *5. The violence in the home and Mother's failure to remove herself and her children from her relationship with Father created a clear potential danger to the children that Mother disregarded. *See N.B.*, 2013 WL 1605457, at *9. Considering the entire record, we find that there is legally and factually sufficient evidence to support termination of Mother's parental rights under Ground D. We, therefore, overrule Mother's first point of error.

## IV.    Sufficient Evidence Supports Termination Under Ground E

Subsection (b)(1)(E) permits termination when the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). "'[E]ndanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *L.E.S.*, 471 S.W.3d at 923; *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.). "It is not necessary that the conduct be directed at the child or that the child actually suffer injury." *L.E.S.*, 471 S.W.3d at 923. "Under subsection (E), it is sufficient that the child's well-being is jeopardized or exposed to loss or injury." *Id.* (citing *Boyd*, 727 S.W.2d at 533; *N.S.G.*, 235 S.W.3d at 367). "Further, termination under subsection (E) must be based on more than a single act or omission. Instead, a 'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.))); *see Boyd*, 727 S.W.2d at 533; *N.S.G.*, 235 S.W.3d at 366–67.

"[Subsection E] refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act." *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied); *see N.S.G.*, 235 S.W.3d at 366–67. "The conduct to be examined includes what the parent did both before and after the child was born." *S.K.*, 198 S.W.3d at 902; *see N.S.G.*, 235 S.W.3d at 367. "To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct." *In re Z.M.*, 456 S.W.3d

677, 686 (Tex. App.—Texarkana 2015, no pet.) (quoting *Perez*, 148 S.W.3d at 436); *see In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *N.S.G.*, 235 S.W.3d at 367.

"A fact-finder 'can consider the history of abuse between the mother and the father for purposes of subsection[] . . . (E), even if the children are not always present.'" *In re Z.M.*, 456 S.W.3d 677, 686 (Tex. App.—Texarkana 2015, no pet.) (quoting *In re A.V.M.*, No. 13-12-00684-CV, 2013 WL 1932887, at *5 (Tex. App.—Corpus Christi May 9, 2013, pet. denied) (mem. op.)). Here, it was undisputed that Mother and Father had a history of domestic violence. That said, Mother continued to expose herself and her children to that violence. Mother admitted that when the Department returned the children to her, on the condition that she stay at Rahab's, she had always intended to leave Rahab's with the children and return to live with Father once he got out of jail. Father was in jail the entire six months Mother spent at Rahab's, but about a week after getting the children back, she left Rahab's without informing the Department and went to Fort Worth because Father would soon be released from jail.

After Father was released from jail, Mother began living with Father again. Mother acknowledged that she was concerned for her safety and that her initial, minor concerns "slowly got worse and worse . . . [b]ut quickly." Mother also testified that, "[e]very other day" from the beginning of 2019 through May 2019, she and Father engaged in "altercations that were domestic." Those altercations included both physical abuse—including pushing and punching each other—emotional abuse, and "yelling and punching and breaking things." Indeed, Father got tattoos over his knuckles to cover bruises he received when punching a wall. Rather than leave this violent

16

situation, Mother consistently exposed herself and her children to it, evidencing a lack of protective capacity. *See S.K.*, 198 S.W.3d at 902.

In addition, K.R. was bruised over her face, head, and abdomen while on an unsupervised visit with Mother. Berry testified that the bruises on K.R.'s face and abdomen were "never normal" for a child her age, and Reeder testified that the bruises and other symptoms were not the result of play but were most consistent with abuse. Mother was supposed to supervise Father's time with the children because one of his hair-follicle tests came back positive for cocaine. Mother admitted that Father could have caused K.R.'s injuries, but she did not know when it could have happened, showing a failure to properly supervise Father when the children were in his presence. Mother continued living with Father after the incident.

"[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. Drug use and its effect on a parent's life and h[er] ability to parent may establish an endangering course of conduct." *In re J.L.B.*, 349 S.W.3d 836, 848 (Tex. App.—Texarkana 2011, no pet.) (quoting *N.S.G.*, 235 S.W.3d at 367–68); *see In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009); *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.) ("Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child."). "Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)." *Walker v. Tex. Dep't Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Vasquez v. Tex. Dep't Protective &*

*Regulatory Servs.*, 190 S.W.3d 189, 195–96 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("terminating parental rights despite there being no direct evidence of parent's continued drug use actually injuring child")).

While there was no evidence of Mother using drugs, Mother admitted that Father was both using and selling drugs. When the couple was residing together in Longview and Mother was pregnant with her latest child, she told Lewis-Pittman that Father "was still using drugs" and that "he was back to dealing drugs again" too. Lewis-Pittman testified that it was not safe for a pregnant woman to be in a home with someone who was using and selling drugs because there was a risk to the unborn child.

Furthermore, Mother had no employment and very unstable housing during the pendency of this case. When she left Rahab's in November 2018, she was in Fort Worth for two weeks waiting on Father to get out of jail. Mother stayed in a motel room in Gainesville through the Thanksgiving holiday. Because she had no money, her father paid for the motel room. In early January 2019, she and Father moved to Dallas to live with his mother. In mid-February, they obtained an apartment where they lived until the following July. Afterward, the couple "struggled paying for different motels," stayed with friends, and eventually obtained an apartment in Irving, Texas, in September. While Mother admitted that her housing was "[n]ot perfectly" stable, she was trying.

Having considered the entire record, we find that Mother took a "voluntary, deliberate, and conscious course of conduct" that continually endangered the children's well-being or placed the children with someone who endangered their well-being. *L.E.S.*, 471 S.W.3d at 923. Therefore,

we conclude that the evidence is both legally and factually sufficient to support the trial court's findings by clear and convincing evidence under Ground E. As a result, we overrule Mother's second point of error.

## V. There is Sufficient Evidence that Termination is in the Children's Best Interests

In her fourth point of error, Mother contends that the evidence is legally and factually insufficient to show that termination of her parental rights was in the best interests of the children. We disagree.

### A. Standard of Review

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). "Termination 'can never be justified without the most solid and substantial reasons.'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

In determining the best interests of a child, courts consider the following *Holley* factors:

(1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see E.N.C.*, 384 S.W.3d at 807; *see also* TEX. FAM. CODE ANN. § 263.307(b). "It is unnecessary to prove all of

19

these factors as a condition precedent to parental-rights termination." *In re C.A.J.*, 459 S.W.3d 175, 183 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 27). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

### B. Analysis of the *Holley Factors*

At the time of trial, L.W. was two years old and K.R. was about one year old. Lewis-Pittman testified that Mother engaged with the children and played well with them during her visits and that the children were happy to see her. Even so, L.W.'s and K.R.'s desires about remaining with Mother are unknown. We, therefore, find the first *Holley* factor to be neutral because L.W. and K.R. were too young to express their wishes. *See In re H.C.*, 602 S.W.3d 654 (Tex. App.—Texarkana 2020, no pet.) (citing *In re S.L.W.*, 529 S.W.3d 601, 613 n.9 (Tex. App.—Texarkana 2017, pet. denied)); *In re A.R.*, No. 06-20-00013-CV, 2020 WL 3865372, at *6 (Tex. App.—Texarkana, July 9, 2020, no pet. h.) (mem. op.); *In re J.M.*, No. 06-19-00106-CV, 2020 WL 1802876, at *4 (Tex. App.—Texarkana, Apr. 9, 2020, no pet. h.).

We address the second, third, and eighth *Holley* factors together. At the time of trial, Mother had three children under the age of three, and such young children require a great deal of time, attention, and protection. Parides testified that Mother needed "extra support." At the time of trial, L.W. had upcoming appointments with a therapist due to behavioral issues.

The evidence presented at trial established that Mother repeatedly and consistently chose to expose the children to domestic violence. *See In re R.R.*, 294 S.W.3d 213, 236 (Tex. App.—Fort Worth 2009, no pet.) (exposure to domestic violence relevant when determining best interest).

The Department initially got involved in this case due to Father throwing Mother onto the floor and choking her in front of the children. Mother's plan to leave Rahab's and return to Father as soon as the children were returned to her indicates that she lacks necessary protective instincts to keep the children safe from domestic violence. Even after the children had been removed from her care for the second time, Mother continued to live with Father albeit they pushed and hit each other "[e]very other day." By the time of trial, Father was in jail and Mother was living independent of him with no plans to return. Yet, the trial court could have inferred that Mother's history of participating in and tolerating domestic violence was likely to recur in the future if the children were returned to her care. *See In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."); *In re J.A.P.*, No. 06-08-00092-CV, 2009 WL 839953, at *3 (Tex. App.— Texarkana Apr. 1, 2009, no pet.) (mem. op.) (finding that history of assault should be considered in determining best interest). A fact-finder is "not required to ignore a long history of dependency and abusive behavior merely because it abates as trial approaches." *In re M.G.D.*, 108 S.W.3d 508, 513 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

In addition, K.R.'s injuries are a cause for great concern for the child's best interest. Although Mother claimed that L.W. had accidentally injured K.R., Berry testified "[w]ith reasonable medical certainty" that two-year-old L.W. could not have caused the kinds of bruises found on K.R.'s body. Furthermore, Reeder testified that K.R.'s injuries were the result of physical abuse. Mother also admitted that Father could have injured K.R., even though Mother was supposed to be supervising his time with the children. As Lewis-Pittman explained, this

21

demonstrates a "lack of protective capabilities." Thus, the trial court was free to disbelieve Mother's explanation and to infer that Mother failed to properly supervise Father's time with K.R. Therefore, having considered the children's current and future needs, the current and future danger to the children, and Mother's parental and supervisory omissions, we find that the second, third, and eighth *Holley* factors favor termination.

We address the fourth and fifth *Holley* factors together. A parent's inability to provide adequate care for a child, lack of parenting skills, and poor judgment may be considered when looking at the child's best interests. *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.). In reviewing the parental abilities of a parent, a fact-finder can consider the parent's past neglect or inability to meet the physical and emotional needs of the children. *D.O. v. Tex. Dep't of Human Servs.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no pet.), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 267. A parent's lack of motivation to learn how to improve parenting skills is evidence supporting the best-interest determination. *Wilson v. State*, 116 S.W.3d 923, 930 (Tex. App.—Dallas 2003, no pet.).

Here, even though Mother had completed her required parenting classes and psychological evaluation, she was in three different domestic violence shelter programs during the pendency of this case. She left one such shelter to return herself and the children to Father. Mother also failed to complete her counseling and had not mastered the necessary skills despite testimony that she needed extra support. Furthermore, several witnesses from Mother's time at Rahab's testified that Mother was angry, abusive, and defensive when the children were in her care. Avery described her as "verbally abusive" and physically abusive toward the children. She saw Mother slap the

22

children and heard her say that she did not care if the "baby cried all night" because "[s]he wanted her to shut up." Meyers testified that Mother often left her children with others at the shelter or left them unattended for extended periods of time. Wilcox, Mother's mentor at Rahab's, testified that Mother was unconcerned when K.R. had difficulty breathing and became agitated when given parenting advice. The trial court could have believed their testimony and, combined with Mother's inability to stay in one domestic violence program and her poor judgment in repeatedly returning herself and her children to her abuser, found that this evidence established a lack of parental abilities and a refusal to utilize available programs. Accordingly, the fourth and fifth *Holley* factors weigh in favor of termination.

The sixth *Holley* factor also weighs in favor of termination. The last job Mother had for a significant length of time was in 2004 when she worked for five months at a factory. But she claims she was "putting in job applications" and had a job "lined up" at Kentucky Fried Chicken. If the children were returned to her, she testified that she planned to rely on friends, donations, and a $300.00 monthly payment from the Temporary Assistance for Needy Families program. She agreed that it was not in the children's best interests that she rely on the generosity of others to support them. The trial court was free to find that Mother's plans were vague and unrealistic. We, therefore, find the sixth *Holley* factor weighed in favor of termination.

In addition, Mother's home was very unstable. Brooke Davis, the children's CASA[9] representative, testified that Mother's living situation was her primary source of concern. Davis testified that the Hiway 80 Rescue Mission, where Mother was residing at the time of trial, was

[9]Court Appointed Special Advocate.

23

not a suitable environment in which to return the children and that she did not believe that Mother could provide the children with a safe environment. Although Mother had been residing at Hiway 80 since November 2019, she admitted that, during the pendency of this case, she had lived in three different shelters; in Fort Worth, Dallas, and Irving; and in various motels and friends' homes. She testified that she had already applied to return to Rahab's and was looking for areas that accepted "housing applications." The trial court could have determined that Mother's home was too unstable to support the children's needs. Therefore, the seventh *Holley* factor weighs in favor of termination.

We also consider the children's placement options. Foster Mom testified that L.W. and K.R. had been in her care for about eighteen months, and while K.R. was progressing normally and talking a lot, L.W. got "very angry" at times and would bang her head against the wall. Lewis-Pittman testified that, in L.W.'s time with Foster Mom, the child had "come a long way as far as developmentally-wise, emotionally." Though Foster Mom was not a candidate for long-term placement, the Department had located the children's cousin, who had already obtained a home study approving the placement of the children there.

Having considered all the evidence, we find that there is legally and factually sufficient evidence from which the trial court could have found that termination of Mother's parental rights to L.W. and K.R. was in the children's best interests. As a result, we overrule this point of error.

## VI.    Conclusion

We affirm the trial court's judgment.

24

Scott E. Stevens
Justice

Date Submitted: July 20, 2020
Date Decided: August 13, 2020